ENGLISH v. MICHIGAN CENTRAL RAILROAD CO.

RAILROADS—CARRIERS—NEGLIGENCE—FELLOW SERVANTS—COMPARATIVE NEGLIGENCE.

In an action for the unlawful killing of a railroad employee, caused by a freight car coming in contact with an ice chute which decedent and his co-servants were charged with the duty of placing far enough from the track so that cars would not strike it, the negligence of decedent was of equal degree with the negligence of his fellow employees, whether he actually assisted in placing the chute, or was merely present and saw the work done, and his estate could not recover for his death. See Act No. 104, Pub. Acts 1909.

Error to Van Buren; Des Voignes, J.   Submitted

April 22, 1915. (Docket No. 111.) Decided September 29, 1915.

Case by Edith English, as administratrix of the estate of Alyn J. English, deceased, against the Michigan Central Railroad Company for the unlawful killing of plaintiff's decedent. Judgment for plaintiff. Defendant brings error. Reversed; new trial denied.

*Gore & Harvey* (*Henry Russel* and *Frank E. Robson*, of counsel), for appellant.

*Fred C. Cogshall* and *Thomas J. Cavanaugh*, for appellee.

Defendant company maintains in the city of South Haven, Mich., a large icehouse. This it fills with ice in the winter, and in the summer uses it for the purposes of refrigeration. A side track runs alongside of the icehouse. On the side of the icehouse toward the siding there is erected a platform high enough to permit refrigerator cars to be supplied with ice through the top. This platform is supported at its side nearest the siding by upright posts 8 by 8 inches. Between the posts and the building were placed heavy boards, crossing each other, so as to brace and strengthen the platform. The posts were 8 or 9 feet apart and 4 feet from the siding. In unloading ice from a loaded car into the icehouse, defendant used a movable chute about 18 feet long and 3½ feet wide. It was built of heavy oak material and required two men to handle it. After a car of ice was placed in front of the opening into which it was to be delivered, it was the duty of those engaged in the operation to place one end of the chute in the door of the car and the other in the opening into the icehouse. The ice from the car was then passed along the chute into the house, until the last tier was reached, when the chute was lowered to a "horse" placed on the ground near the car, when the last tier

likewise was unloaded. After a car was unloaded, the string of cars would be moved until the next loaded car came opposite the opening, when the whole operation would be repeated. When the entire string was empty, it would be removed, and a number of loaded cars would be placed on the siding.

On the morning of January 30, 1912, plaintiff's decedent, together with two other employees of the defendant company, named Edmonds and Greenman, were engaged in unloading ice at the place described. They had unloaded one car, which was the last one to be unloaded of those upon the siding at the time. As soon as that operation was completed the empty cars were removed from the siding in an easterly direction. It is the claim of the plaintiff, supported by the testimony of Edmonds, that after the last car was unloaded he and his associate, Greenman, who were standing on the ground under the platform and on the east side of the chute, placed the chute upon the "horse" in a position which he thought to be far enough away to escape the side of cars moving upon the track, and that the empty cars were moved out after they had so placed it; that, at the time it was so placed, plaintiff's decedent, English, was standing west of the chute, and between the chute and the upright post supporting the platform; that he was facing the east, the direction from which the loaded cars were to come. There is evidence in the record tending to show that English, plaintiff's decedent, actually helped Edmonds and Greenman to place the chute upon the horse in the position it occupied at the time of the accident. All witnesses of the accident agree that, at the time the loaded cars were backed in, plaintiff's decedent, as well as Edmonds and Greenman, faced the east, the direction from which the train came. Upon the top of the first of the advancing cars stood a brakeman, whose duty it was to see that the track was clear and to signal

the engineer. It was the testimony of the brakeman that he had given the "easy" signal to the engineer, and that the train was proceeding about as fast as a man could walk; that he noticed the position of the chute, but believed from his observation that it was placed far enough away from his train to avoid collision. The front end of the car actually missed the end of the chute; but, when the center of the car was reached, the extreme end of the chute was caught, probably by some of the fittings about the door. The impact carried the end of the chute off the "horse" and against plaintiff's decedent, who was standing against, or very near, the post, and so crushed him that he died some nine days thereafter.

Touching the question as to how and by whom the chute was placed, the witness Edmonds testified as follows:

"Mr. Greenman and myself manipulated and placed the ice chute. After the car was unloaded, as I say, we put the chute out so as to clear the car, and an engine came in and picked up the string of empties that we had unloaded that morning and pulled them out. We men stayed there by the chute, on the east side. Mr. Greenman was on the east side. Mr. English was on the west side. There was a post on the west side. * * *

"*Q.* Did you see the cars pulled there?

"*A.* Noticed them in a general way. We stood there while they pulled that string of empties out. Those cars were moved eastward. No portion of the cars that were pulled out struck this chute. The cars that were to the west of it passed clear. They were box cars all of them.

"*Q.* Now, you and Mr. Greenman remained there in that locality until they returned?

"*A.* Yes, sir.

"*Mr. Gore:* Let him tell what they did, please.

"*Q.* Were you doing anything while they were out for this other load?

"*A.* No, sir.

"*Q.* Was this chute that had been placed by you and Greenman changed while they were gone?

"*A.* Not at all.

"*Q.* Did you notice the trainmen returning?

"*A.* We noticed a string of cars coming in."

On cross-examination this witness testified in part as follows:

"I stated that Mr. English was on the west side of the chute at the time he got hurt. I was on the east side. Westgate and Greenman were also on the east side. Mr. English was the only one of the crew that was on the west side, and he was standing between the side of the chute and this upright post, leaning against the post. There were 2½ or 3 feet of space between the side of the chute and the post, a short distance. I had been there in that position 10 or 15 minutes. I should judge; maybe a little longer. Mr. English had been there about the same length of time. We were watching for cars to be backed in; that is, cars loaded with ice. We were standing at the east side of the icehouse. Between these upright posts and the building itself, in the space under the porch between those posts and the building, there are some boards put crosswise to act as braces. One board would start at the upper side of the post and run down near the ground to the building, and the other would cross it in the other direction. I suppose that was to strengthen the porch. We had occasion sometimes, when filling and icing cars, to use the top of that porch. I believe this is what it was there for. I had been waiting, I think, on the east side, and Mr. English on the west side, some 10 or 15 minutes, when the car backed in. That chute is a good, heavy article. It is all a couple of men want to pick up and carry. It is strongly made and well adapted for handling ice. It is a strong, well-made chute. Before the injury to Mr. English, we had used the chute a day we had worked together. The chute was all right, weight and all. * * *

"*Q.* No; I mean after you got down to the last tier, how far would you shove the chute out on the horse before you commenced to unload the last tier?

"*A.* Well, that would all depend on how far in the car it was when you were taking out the top tiers. You would have to shove it out, so the end of the chute would be clear of the car.

"*Q.* Well, that is what you did?

"*A.* That is what we did.   *   *   *

"*Q.* Well, under the way you handled your business there, it was not the particular duty of any two to place the chute, but just those that happened to take hold of it and handle it; that is about the way you worked it, wasn't it?

"*A.* Why, that was the—why, that was the simple way of doing it.

"*Q.* That those two men that happened to be convenient to it would handle it?

"*A.* As a rule.

"*Q.* That is what I mean. In other words, it was just as much the duty of one man to handle it as it was the other?

"*A.* Why, certainly; it is three working together and not shirk. In moving that chute from its position in the car, most generally we got out of the car to handle it; jumped down and handled it with our hands, one on each side. Then we got back in the car."

The witness Greenman testified in part as follows:

"*Q.* You assisted in placing the chute on the horse?

"*A.* Yes, sir.

"*Q.* And Mr. English?

"*A.* Yes, sir.   *   *   *   George Edmonds and Mr. English, the deceased, assisted in putting it up there. I think Edmonds was on the east side, the same side I was on. Mr. English was on the west side.   *   *   *

"*Q.* State now what, if anything, you and Mr. English did before the cars were backed in that morning.

"*A.* We put the end of the chute on the horse.   *   *   *

"*Q.* How far north of the top of the horse did you and Mr. English shove the chute?

"*A.* Well, we supposed we shoved it far enough so it would clear the car.

"*Q.* State whether you had that in view.

"*A.* Yes, sir.

"*Q.* Was there anything to prevent you from having left the end of the chute a foot from the car?

"*A.* No, sir."

The declaration, filed under Act No. 104, Pub. Acts 1909, charges the defendant with negligence in many respects. No competent evidence, however, was introduced sustaining any of the charges of negligence, except the one that defendant through its agents had negligently placed the chute too near the track upon which they knew loaded cars were about to come in. As to the other alleged elements of negligence, the court, we think, properly charged the jury as follows:

"Now, upon that question, gentlemen, I charge you as a matter of law that it appears by undisputed evidence that the platform, the icehouse, the chute, the wooden horse, the cars, the tracks, and all the instrumentalities used by the defendant in the movement of ice from the switch track into the icehouse, were in a sound state of repair, and that the defendant had performed its duty in that respect."

At the conclusion of the plaintiff's case, defendant moved for a directed verdict upon the following grounds:

"(1) The defendant omitted no duty which it owed the deceased.

"(2) There is no evidence tending to show negligence on the part of the defendant.

"(3) The deceased was clearly guilty of negligence contributing to his injury.

"(4) It is undisputed that the negligence of the plaintiff and his fellow servants was the sole cause of the accident.

"(5) The proximate cause of the injury was the placing of the chute too close to the track; and the defendant is not even connected, by the evidence, with such act.

"(6) It appears by the undisputed evidence that the tools and appliances, the cars and the chute, were in sound condition and without any defects whatever.

"(7) The entire work of placing the chute too close to the track was obvious to the plaintiff.

"(8) The defendant could not anticipate that the plaintiff and his fellow servants would place the chute in such dangerous proximity to passing cars as to be dangerous; but, on the other hand, the defendant had a right to presume that the plaintiff and his fellow servants would act with reasonable prudence for their own safety.

"(9) The most that can be claimed under the evidence, for the plaintiff, is that the occurrence was an accident pure and simple."

This motion was denied, and the court submitted the case to the jury upon the single question as to whether the defendant company was guilty of negligence in placing the chute too near the track. Upon this question the court charged the jury as follows:

"In this case, gentlemen, it is the contention of the defendant that all of the eyewitnesses to the accident have been called, to wit, Greenman, Edmonds, and Westgate; and it is the defendant's contention that all of the witnesses, save Edmonds, have testified to the fact that the decedent assisted in placing this chute upon the horse a short time before the cars were pushed down on the siding. Plaintiff, upon the other hand, disputes the fact that the witnesses have so testified. As I have already stated to you, gentlemen, the plaintiff has the burden of showing by a preponderance of the evidence the material allegations necessary for her to recover in this case. If upon this question as to the placing of the chute you should find from the evidence that the decedent, English, did assist in placing the chute upon the horse at the time referred to, then the plaintiff cannot recover in this case, and you need inquire no further, but return a verdict of no cause of action."

Upon the question of negligence he further charged:

"If, upon the other hand, you find that both were guilty of negligence, that is, both were guilty of contributing to this accident to the extent that it was negligence, then you should consider and determine to

what extent or to what degree the defendant was negligent, and to what extent and degree the plaintiff was negligent; in other words, the degree of negligence of each, that is, the decedent's as well as the defendant railway company's negligence. If deceased, Alyn J. English, was guilty of greater negligence, that is, a greater degree of negligence than the defendant railway company, then the plaintiff cannot recover. On the other hand, if defendant railway company was guilty of a greater degree of negligence than Alyn J. English, the plaintiff's decedent, then plaintiff would be entitled to recover.

"And, again, gentlemen, if under the testimony, a careful inquiry of the evidence, and a careful analysis, you are unable to determine which of the parties, that is, whether the deceased or the railway company was guilty of the greater degree of negligence, and that it is equal or evenly balanced as to the degree of such negligence, then the plaintiff cannot recover.

"Now, in this connection, in relation to the degree of negligence, if you find that the injury resulting in the death of plaintiff's husband was caused by placing the ice chute too close to the railroad track, and that plaintiff's husband was not responsible for it being placed there, then I charge you that the defendant in this case is liable for the negligence of his coemployee so placing it, and the plaintiff may recover, even if her husband was guilty of negligence, providing that the negligence of her husband was of a lesser degree than the negligence of the defendant railroad company.

"Whether the plaintiff's husband was guilty of contributory negligence, or not, is a question of fact for you to determine. If you find that he was not guilty of contributory negligence, then you will not be concerned with the degrees of negligence; and if you further find that the defendant or its employees or servants were guilty of negligence, and that such negligence of defendant, its employees or servants, resulted in the injury and death of plaintiff's husband, then your verdict should be for the plaintiff.

"Again, if you find that the defendant was negligent, and that such negligence resulted in the injury and death of plaintiff's husband, and you also find that the plaintiff's husband was guilty of negligence

which contributed to his injury, then I charge you that the contributory negligence of the husband will not bar a recovery by the plaintiff in this case, provided that the negligence of her husband was of a lesser degree than the negligence of the defendant, its officers, agents, or employees.

"I charge you, under the declaration in this case, you have no right to consider, as bearing upon the alleged negligence of the defendant, the statement of witnesses that there was snow, ice, sawdust, and hay under the porch to the icehouse and in the vicinity of where the men were about to engage in removing ice from the car. If, after considering all the evidence in the case, you find that there is no fault or negligence that can be fairly charged to any one, neither the defendant, nor the deceased, nor other employees, then I charge you that the occurrence was an accident pure and simple, and the defendant is not responsible, and your verdict should be for the defendant.

"In other words, there can be no liability unless there was negligence, and if no one connected with the injury of Mr. English is chargeable with negligence then you should return a verdict for the defendant."

A special question was submitted to the jury as follows:

"Did the deceased, Alyn Jay English, assist in placing the chute where it was at the time of the accident?"

This question was answered in the negative by the jury, and a general verdict rendered in favor of plaintiff.

BROOKE, C. J. (*after stating the facts*).    Section 2 of Act No. 104, Pub. Acts 1909, provides that:

"The fact that the employee may have been guilty of contributory negligence shall not bar a recovery: *Provided,* that the negligence of such employee was of a lesser degree than the negligence of such company, its officers, agents or employees."

We are of opinion that it must be held that plaintiff was precluded from recovery under the statute counted

upon, as a matter of law. Her decedent, together with Edmonds and Greenman, were charged with the duty of handling and placing the chute in a position of safety. According to all the testimony, he alone was on the west side of the chute, standing in a space from 2½ to 3 feet wide, between the chute and the post. If, as claimed by plaintiff's witness Edmonds, he did not actually assist in placing it in the position it occupied at the time of the injury to him, he at any rate was immediately present during the entire operation. It is entirely apparent, from the testimony above quoted, that Edmonds and Greenman believed they had placed the chute far enough away from the track to escape the oncoming train. It further appears from the record that the brakeman stationed on top of the first oncoming loaded car believed that the chute was so placed. It must be obvious, we think, that plaintiff's decedent shared in this belief, because he occupied a position of extreme danger between the chute and the post in a confined space, where he was certain to be injured in case the end of the chute projected too far toward the track. The chute was placed in position in his immediate presence, even if he did not assist in placing it, and according to the testimony of Edmonds the duty of placing it devolved as much upon him as it did upon Edmonds and Greenman. It therefore is of no importance whether he actually assisted in placing it or not.

If this unfortunate occurrence is not a pure accident, due to an excusable error in judgment on the part of the plaintiff's decedent and his fellow servants, for which no one is responsible, it is then the result of the negligence of Greenman and Edmonds and plaintiff's decedent, and it must be said, under the circumstances disclosed by this record, that the negligence of plaintiff's decedent is not less than that of his fellow servants; the three being equally charged with the per-

formance of the duty claimed to have been violated. This being true, the statute forbids recovery.

The judgment is reversed, and there will be no new trial.

KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice MCALVAY, to whom this case was assigned, took no part in this decision.